United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAWRENCE HARRY PAMER, | No. C 04-3252 SI (pr) |
| Plaintiff, | **ORDER GRANTING SUMMARY JUDGMENT MOTIONS** |
| v. | |
| CALIFORNIA DEPT. OF CORRECTIONS; et al., | |
| Defendants. | |

## INTRODUCTION

This action is now before the court for consideration of two defense motions for summary judgment, plaintiff's motion to file a third amended and supplemental complaint, and plaintiff's motion for injunctive relief. Defendants Lucine, Wittenberg and Jimenez urge in their motion that they are entitled to judgment as a matter of law because the action is time-barred, as well as on the merits of plaintiff's claim and their defense of qualified immunity. Defendant Clark urges in his separate motion that he is entitled to judgment as a matter of law on the merits of plaintiff's claim and the defense of qualified immunity. Plaintiff opposes both motions. For the reasons discussed below, defendants' motions for summary judgment will be granted and plaintiff's motions denied. Judgment will be entered in favor of the defendants.

**BACKGROUND**

Lawrence Harry Pamer was involved in a cell fight during which he suffered injuries. In this action, he claims that several members of the medical staff were deliberately indifferent to his serious medical needs in their response to his injuries after the cell fight.[1] This action was filed 4 years and 11 months after the cell fight, and more than four years after he was transferred out of the prison at which defendants' allegedly deficient medical care occurred. The following facts are undisputed unless otherwise noted:

A.  Medical Care Facts

Pamer was involved in a cell fight on August 23, 1999, while incarcerated at Salinas Valley State Prison. His cellmate struck him several times and Pamer inflicted harm on his cellmate. Prison staff used pepper-spray on the fighting inmates and stopped the fight. His cellmate broke free of guards and kicked Pamer in the head. Pamer and his cellmate were taken to wash off the pepper spray. Pamer was then taken for medical evaluation.

Pamer's initial medical evaluation was conducted by defendant medical technical assistant ("MTA") Jimenez. Jimenez noted on the form that Pamer had multiple contusions on the left forehead and left occipital skill, abrasion and contusion on the nose, contusions and abrasions on his torso, and a 5th finger deformity. Her notes indicated that she gave him an ice pack for his right hand. When asked what he told MTA Jimenez, Pamer testified: "I don't remember what I told her, but, I mean, you could – I was pretty – I mean this thing is hanging out like that," referring to his pinkie finger. Pamer Depo., RT 59:9-13.

Pamer was transported to the correctional treatment center ("CTC"), a hospital on the prison grounds, later that day. His chief complaint was that his finger was dislocated and he had multiple contusions. There also was evidence of trauma to his head and extremities, and that he suffered multiple minor abrasions on his face and head. Pamer denied losing consciousness.

---

[1] Pamer also alleged a claim that several correctional officials were deliberately indifferent to a risk to his safety by not granting his request for a cell move before the cell fight. The defendants on the deliberate indifference to safety claim (as well as one doctor) were dismissed earlier after service of process was unable to be accomplished on them.

2

At the CTC, Dr. Wittenberg noted that Pamer was "alert + oriented x 3," which meant Pamer was awake and in normal mental state. Dr. Wittenberg also noted that Pamer had superficial bruises, abrasions and cuts on his body, had no visual disturbances and no tenderness in his neck. Dr. Wittenberg gave Pamer local anaesthesia and reduced his fractured finger. He prescribed 800 mg. of ibuprofen for pain and recommended that Pamer be scheduled for an x-ray the next day. Pamer was returned to custody. Pamer testified his head was sore and "like mush for like six months." Pamer Depo., RT 52:9-12.

The next day (i.e., August 24), Pamer's finger was x-rayed; the x-ray showed a displaced fractured finger on his right hand. His x-ray was reviewed by Dr. Lucine that day. Pamer was sent to Natividad Medical Center in Salinas for further reduction of the fracture. The prison medical notes stated that he was sent to Natividad "for evaluation & possible reduction & pinning." Pamer Decl. (docket # 54), Exh. B. The notes for August 24, 1999, also stated that Pamer was returned from Natividad, with the right fifth "phalanges reduced by ortho & splint applied. RTC F/U [with] ortho as ordered." The notes did not indicate that Pamer complained of significant pain in his head or that he was suffering from a significant head injury. (Neither party submitted any records from Natividad.)

Pamer states that he returned to Natividad for further evaluation on August 31, 1999, and was told to return in another three weeks for a possible pinning of his fractured finger.

Pamer was evaluated again on September 21, 1999, at the prison. The notes on the form "report of injury or unusual occurrence" by MTA Jimenez stated that Pamer complained, "my fingers displaced in the splint. The pain's read bad. I took the splint off yesterday." Pamer Decl., Exh. D. The treatment notes stated that the inmate was given a sling and counseled about removing his splint. Id. The notes did not indicate any complaint of a head injury.

Dr. Lustman referred Pamer to radiology on September 23, 1999. The doctor's orders for that day reflected that the doctor ordered Toradol, Motrin for five days and for "follow up orthopedic on 9-28-99." Pamer Decl., Exh. E. Pamer's finger was x-rayed at the prison on September 23, 1999. The radiologist's impression was that there was "a healing fracture at the base of the proximal phalanx of the fifth digit." Pamer Decl., Exh. C. Pamer states that he had

3

to kick on his cell door to obtain this medical response. Pamer Decl., ¶ 15-16 and Exh. C; Pamer Depo. RT 73, 81.

The records indicated that was the end of Pamer's medical care at Salinas Valley. There are no medical notes indicating any request for or provision of medical care in the period after September 23, 1999, through June 2000.

In June, Pamer was transferred to the California Men's Colony in San Luis Obispo ("CMC"). The outpatient interdisciplinary progress notes indicated that, on June 29, 2000, Pamer was a "new arrival to CMC-E from SVSP." Pamer Decl., Exh. B. The medical file review on June 29, 2000, noted no current medical problems when Pamer arrived at his new prison.

The medical records indicated that Pamer complained to the medical professionals at CMC on November 6, 2000, that he had suffered a fractured finger a year ago and had not received follow-up care for the injury. Pamer received medical care at his new prison. While at his new prison, Pamer complained of ongoing chronic lower back pain for at least six years that he attributed to a 1992 motorcycle accident or when a truck landed on him. On March 12, 2001, Pamer told medical staff at the orthopedic clinic that he was injured in a fight 1-1/2 years earlier. He was examined by a medical staff member who determined that Pamer did not need additional treatment to his hand or wrist. Pamer also complained about lower back pain that he attributed to causes other than the cell fight.

MRIs of Pamer's brain and of his cervical spine were done on May 7, 2002. In the report on the brain MRI, the radiologist wrote, "clinical history: 46-year-old male with headaches." 5/7/02 brain MRI radiology report. The radiologists's impressions were: "1. Multiple small cystic lesions probably representing encephalomalacia within the anterior aspect of the left frontal lobe. 2. Several nonspecific white matter lesions are also present. 3. Ethoid and frontal sinusitis." Id. In the report on the cervical spine MRI, the radiologist wrote, "clinical history: neck and right arm pain." 5/7/02 cervical spine MRI radiology report. The radiologist's impressions were: "1. Moderate to moderately severe cervical spondylostenosis and foraminal narrowing at C5-6 and C6-7. Severe spondylitic narrowing of the right lateral recess and

neuroforamen at C3-4. 3. Additional bilateral foraminal stenosis is present at C4-5 and C7-T1. Small disk protrusion at T2-3." Id. The radiology reports did not state whether the brain or spine abnormalities were attributable to the cell fight injuries.

Defendants presented the declaration of a medical doctor who opined that, based on his review of the records, "Drs. Wittenberg and Lucine and MTA Jimenez appropriately treated inmate Pamer's injuries that he suffered as a result of the August 23, 1999, cell fight. Inmate Pamer's most significant injury appears to have been his fractured finger and the medical professionals at Salinas Valley ensured that he received prompt diagnosis and treatment for this injury (i.e., ice pack to control swelling, referral to the Correctional Treatment Center, reduction of the fracture, pain mediation [sic], application of sling and split, and repeated x-rays). His superficial injuries of abrasions, contusions, and lacerations were duly noted and would have healed in a few weeks." Roche Decl., ¶ 18.

B.   Facts Regarding Dr. Clark

During the relevant time period of August 1999 - June 2000, defendant David Clark was a medical doctor on staff at Salinas Valley. Dr. Clark did not provide any medical care to Pamer during that time period.

Dr. Clark was employed as a staff physician and surgeon. Dr. Clark's duties as a staff physician and surgeon generally included "examining patients and diagnosing their illnesses; prescribing and administering medical treatment; ordering laboratory examinations and analysis, x-rays and special diets; and writing prescriptions." Clark Decl., ¶ 2. It was his custom, and required by virtue of his medical license, to write physician's note and/or a physician's order documenting medical visits and the medical care rendered to a patient. Dr. Clark did not write any physician's notes or physician's orders in Pamer's medical records during the August 1999 - June 2000 time period. Based on his recollection and review of Pamer's medical records, Dr. Clark concluded that he did not provide any medical care or treatment to Pamer during that time period.

During the August 1999 - June 2000 time period, Dr. Clark was not employed as the chief

5

physician and surgeon or as the chief medical officer at Salinas Valley. He also did not hold any supervisory job title or act as a supervisor during that time period. He was not required to and did not supervise the medical care or treatment Pamer received at Salinas Valley during that time period.

When pressed to identify why he sued Dr. Clark, Pamer initially stated that it was because Dr. Clark was in charge of directing medical care at the prison and Pamer thought he was the chief medical officer. See Pamer Depo., RT 99, 103, 105. Pamer said he thought he had seen that written on some medical record, but was unable to find it and eventually conceded that "[i]t might be my mistake." Id. at 104. Pamer then speculated that he "might have even seen him." Id. at 109. When questioned about what exactly his claim against Dr. Clark was, Pamer gave this testimony at his deposition:

Q. So after the fight in 1999, you know, what is your complaint against Dr. Clark?

A. I don't know if I had seen him after that. I think I might have seen him after that. I believe I did see him. I think he was working on the A yard for a minute there, too, I think I talked to him. I think I spoke to him on the yard.

Q. When?

A. In '99.

Q. When in '99?

A. After the fight.

Q. A day after the fight, a week, a month?

A. It was way after, months after. Because I was still trying to get – I was over there trying to get treatment for this.

Q. And what did you see him for?

A. I just seen him walking down the way. He didn't even want to acknowledge me.

Q. So you didn't see him in regards to medical care, you just saw him walking in the yard?

A. Yeah, I was asking him about this, though, when am I going to see an orthopedic specialist?

6

| | | |
|---|---|---|
| 1 | Q. | That wasn't in the context, though, of – |
| 2 | A. | I believe that was him, though. |
| 3 | Q. | You don't even know it was Dr. Clark? |
| 4 | A. | I know I seen him somewhere around there. |
| 5 | Q. | Did you ever see Dr. Clark for medical treatment? |
| 6 | A. | No. |

Id. at 109-110.

C. Statute of Limitations Facts

None of the defendants were involved with Pamer's treatment after he transferred out of Salinas Valley to another prison in June 2000, ten months after he suffered his injuries in the cell fight. Indeed, the medical notes indicate no care was provided at Salinas Valley after September 23, 1999.

Pamer's complaint in this action was stamped "filed" in this court on August 11, 2004. His proof of service shows that he put the complaint in the prison mail on July 29, 2004, to be sent to the court.

Pamer was right-handed. His injured pinkie finger was on his right hand. He was able to write a letter, albeit a short one, to his brother shortly after the fight. He wrote to his brother that he was injured and probably needed help with medical matters.

Pamer was interviewed by correctional lieutenant Washington on October 2, 1999, regarding the August 23, 1999, cell fight. The oral interview was videotaped. The videotape showed Pamer speaking coherently, answering questions and describing the fight as well as his injuries in detail. Pamer complained during that interview that, although his finger had been set within a day after the injury and he returned to Natividad the next week to have his finger re-checked, an institutional lock-down caused him not to be taken back to Natividad three weeks later as scheduled. He claimed he had not received pain pills since September 2, 1999. He also claimed that his head hurt when he opened his jaw for a while after the incident, but it was just "sore a little bit" at the time of the interview and was "almost gone."

7

Pamer later testified that he told Lt. Washington he wanted to get his hand fixed and knew that "something was wrong, because I could feel it." Pamer Depo., RT 70:19-23.  When asked in his deposition why he didn't mention a head injury to Lt. Washington, Pamer testified: "I didn't talk – I didn't even think about it being a head injury at the time." Id. at RT 70:24 - 71:1. In other words, he didn't connect hand/wrist pain to the kick in the head.

Pamer filed an inmate appeal on August 23, 2001, in which he complained of the medical care he had received.  The appeal was 1-1/2 pages long and handwritten by Pamer.  This appeal complained about the care provided for his hand and did not mention any deficiency in the care of his head injury.

Pamer filed an inmate appeal on August 24, 2001, in which he complained that he had "been awaiting approximately 1 year to be fitted for eye glasses." Second Amended Complaint, Exh. B.  He complained that he was unable to read without the glasses and that was interfering with his daily activity.  This appeal was about a paragraph long and handwritten by Pamer.

Pamer filed a typed inmate appeal on June 25, 2002, complaining about the medical care he received after the cell fight.  In this appeal, Pamer focused on his head injury, noting that he had been advised by a doctor on May 22, 2002, of abnormalities noted on a brain MRI done in May 2002.  Pamer attributed the abnormal MRI results to being kicked in the head during the cell fight.

Pamer sent letters to try to obtain legal representation.  He received a letter dated October 18, 2001, from the law firm of Pillsbury Winthrop in which the author referred to Pamer's October 4, 2001, letter, said the firm was "unable to represent [him] individually" and would forward the materials to the Prison Law Office without any guarantee that office would act on his information.  He received a letter dated December 4, 2001, from the law firm of Fisher & Carrasco in which the author referred to Pamer's letter of November 29, 2001, and declined to represent him.  He received a letter dated May 21, 2002, from the L.A. Gay & Lesbian Center in which the author referred to Pamer's letter of June 30, 2002, and declined to represent him. He received another letter dated June 13, 2002, from the law firm of Fisher & Carrasco in which the author referred to Pamer's letter of June 10, 2002, and declined to represent him.  At least

8

several of the law firm letters mentioned statute of limitations deadlines and the need to take action to avoid adverse legal consequences. Pamer also hand-wrote a letter in April 2003 to the First District Appellate Project asking for information about his "writ" on his "three strikes case" and asserting that he had sustained a brain injury in 1999 and "had to learn to write all over again." Pamer Decl., Exh. I.

Other inmates provided some scribe services for Pamer. Inmate Daniel Delicino helped Pamer "by typing a number of medical appeals (CDC 602) while [he] was at CMC State Prison from 2000 thru to 2002" due to Pamer's "disability with his right hand and arm." Pamer Decl., Exh. I. Inmate Normal Sjonborg typed a letter to a lawyer on August 19, 2002, on Pamer's behalf, enclosing various documents from Pamer's medical and prison files and seeking representation for "a personal injury/violation of civil rights/medical malpractice case against the State of California." Pamer Decl., Exh. I.

Defendants' expert, Dr. Roche, stated that his review of the medical records did not uncover any record that demonstrated that Pamer was cognitively impaired, disoriented or confused. To the contrary, Pamer was awake, alert and oriented after the fight. Dr. Roche also found no medical record that reflected that Pamer complained to medical professionals that his head injury was soft, mushy or swollen, although Pamer said he did tell them. Dr. Roche also opined that Pamer's reported vision problems would not have made his uncorrected vision such that he could not read and write, even if he did not have eyeglasses.

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California because the events or omissions giving rise to the claims occurred in Monterey County, which is located within the Northern District. See 28 U.S.C. §§ 84, 1391(b). This Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

9

**DISCUSSION**

A.  The Action Against Lucine, Wittenberg and Jimenez Is Time-Barred

The motion for summary judgment filed by defendants Lucine, Wittenberg and Jimenez argues that the action is time-barred. This requires the court to determine the date this action commenced, the date on which the cause of action accrued, the applicable limitations period, and the applicability of statutory or equitable tolling.

This action was deemed filed on July 29, 2004, the date on which the proof of service attached to the complaint states that Pamer put the complaint in the prison mail to be mailed to the court. See generally Houston v. Lack, 487 U.S. 266, 276 (1988).

The deliberate indifference cause of action against the defendants accrued no later than October 2, 1999 – i.e., the date of the interview by Lt. Washington – because by that point, Pamer stated that he knew he had not been given the further follow-up care that he allegedly was supposed to receive at Natividad 3-4 weeks after the August 23, 1999, cell fight. A cause of action generally "accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." Elliott v. City of Union City, 25 F.3d 800, 802 (9th Cir. 1994) (citation and internal quotation marks omitted) The medical records showed no requests for medical care and no medical care for Pamer after September 23, 1999. Pamer states that he kicked on the cell door seeking medical care because he wanted to see the doctor at Natividad and was in so much pain. He dates that door-kicking incident at about September 23, 1999. Pamer knew of the critical facts that formed the basis of his action against defendants in late 1999. He knew by September 23, 1999, when he allegedly was denied follow-up treatment at Natividad that he may have a claim against prison officials for problems with his medical care. That he knew he hadn't received his follow-up appointment was confirmed in his oral videotaped interview on October 2, 1999, when he complained about that very problem.

At the relevant time, the limitations period was one year. Section 1983 does not contain its own limitations period. The appropriate period is that of the forum state's statute of limitations for personal injury torts. Elliott, 25 F.3d at 802. Because California has multiple statutes of limitations for different torts, the court borrows the general or residual statute for

10

personal injury actions to use for a § 1983 action. See Silva v. Crain, 169 F.3d 608, 610 (9th Cir. 1999). The general residual statute of limitations for personal injury actions was the one-year period set forth at former California Civil Procedure Code § 340(3) and was the applicable statute in § 1983 actions. See. id.[2]

The court must give effect to a state's tolling provisions. See Elliott, 25 F.3d at 802. California recognizes imprisonment as a disability that tolls the statute of limitations for a maximum of two years when a person is "imprisoned on a criminal charge, or in execution under the sentence of a criminal court for a term of less than for life." Cal. Civ. Proc. Code § 352.1(a). The tolling allowed for the disability of imprisonment applies because Pamer's sentence is less than for life in prison. See Grasso v. McDonough Power Equip, 264 Cal. App. 2d 597, 601 (Cal. Ct. App. 1968).

Using the accrual date of October 2, 1999, plus the one-year limitations period plus the two-year tolling period for Pamer's imprisonment, Pamer's deadline to file this action was no later than three years later on October 2, 2002. The change in the limitations period effective January 1, 2003, did not aid him because his claim was already time-barred and could not be revived.

"Where the danger of prejudice to the defendant is absent, and the interests of justice so require, equitable tolling of the limitations period may be appropriate." Azer v. Connell, 306 F.3d 930, 936 (9th Cir. 2002). Pamer claims that his failure to meet the deadline should be excused or he should receive equitable tolling for several reasons: his writing hand was in a cast, he suffered a severe brain injury, he was unable to obtain eyeglasses, he could not access the law library for legal research, and he could not find anyone to assist him in writing his complaint. None of his arguments are persuasive.

Assuming for purposes of argument that a litigant's physical and mental impairment may

---

[2] The limitations period for personal injury actions is now two years. See Cal. Code Ci. Proc. § 335.1. The two-year period "applies to actions not already time-barred by the one-year statute of limitations [in former §340(3)] when section 335.1 became effective on January 1, 2003." Andonagui v. May Dept. Stores Co., 128 Cal.App.4th 435 (Cal. Ct. App. 2005). The enactment of § 335.1 did not revive Pamer's claim because it was already time-barred before § 335.1 became effective.

11

support equitable tolling, there is not enough evidence of such impairment here. Pamer's contention that his impairments warrant equitable tolling are not persuasive because of the extensive evidence of the various activities he did undertake during the time he contends he was physically and mentally unable to file suit. The court need not credit a party's version of the facts that is "blatantly contradicted by the record." Scott v. Harris, 127 S. Ct. 1769, 1776 (2007). Writing may have been difficult, but it was not impossible even in the time immediately after the injury. He hand-wrote a short letter immediately after the fight, thus indicating he was not unable to write. He hand-wrote inmate appeals on August 23 and 24, 2001, and hand-wrote a letter in April 2003 to the First District Appellate Project. Not only was he demonstrably able to write by himself, he could and did have other inmates help him. Another inmate sent a letter seeking legal representation for Pamer on August 19, 2002, and yet another inmate helped him by typing a number of medical appeals in 2000 - 2002. Either Pamer or someone helping him sent letters trying to retain lawyers in October 2001, November 2001, and June 2002. None of the documentary evidence supports any contention that he was unable to think clearly. The medical notes indicated he was alert and oriented immediately after the kick in the head. Neither the videotape of the October 2, 1999, interview with Lt. Washington nor the content of the documents written by Pamer in 2001 and later reflected a confused and disoriented inmate. Lastly, even if one assumes that Pamer needed but did not have eyeglasses, the various documents that were prepared by him and on his behalf undermine any serious argument that vision problems precluded the filing of this action in a timely manner. Pamer's physical and mental problems were not such that equitable tolling is warranted. Further, there is a dearth of evidence explaining the 2-year delay immediately preceding the filing of this action in July 2004. The record shows sporadic activity and does not support a finding that Pamer acted reasonably and with diligence in asserting his rights.

Pamer complains that there was limited law library access. That limited access apparently was at Salinas Valley and he left that prison four years before he filed this action. See Pamer Depo., RT 126. Pamer also complains that he lacked a legal education, id. at 127, but that is not an exceptional circumstance and instead is a characteristic shared by most prisoners. The

12

1 statutory tolling for the disability of imprisonment is at least in part a recognition that prisoners
2 sometimes need extra time to prepare their claims due to the limits on them in custody.
3 See Elliott, 25 F.3d at 803. "Disability statutes are meant to 'protect those who are incapable of
4 protecting themselves;' . . . they apply to prisoners in recognition of their more limited ability
5 to investigate their claims, to contact lawyers and to avail themselves of the judicial process."
6 Id. (citation omitted). It is at least doubtful that equitable tolling would be proper for the same
7 conditions essentially covered by the statutory provision that allowed two extra years for the
8 disability of imprisonment. The limitations period will not be equitably tolled.

9       The undisputed evidence shows that Pamer knew of the allegedly deficient medical care
10 by September 1999, was complaining to prison officials about it by August 2001, and was trying
11 to find a lawyer to represent him by October 2001. Nonetheless, he waited until the end of July
12 2004 to file his civil rights complaint. The complaint was filed inexcusably late. The statute
13 of limitations had expired in September or October 2002, almost two years before Pamer filed
14 this action. The complaint is barred by the statute of limitations. Defendants are entitled to
15 judgment in their favor as a matter of law.[3]

16       Pamer only focused on the "brain injury" angle to his hand/wrist problems after an MRI
17 of his brain in May 2002 showed abnormalities and a neurologist apparently indicated that
18 Pamer's hand/wrist problems had a neurological source.[4] This does not help Pamer because the

---

[3] Pamer stated in his declaration that some of his medical records disappeared when he turned them over to a defense attorney who turned them over to the litigation coordinator for copying. Pamer Decl., ¶ 23; but see Pamer Depo., RT 110-111 (Pamer blaming cell searches by custodial staff for documents missing from his medical files on day of deposition). Even if his contention is true, it would not aid Pamer because it is not relevant to the timeliness question and therefore does not warrant a continuance under Rule 56(f). Pamer reports that the documents "refer to possible pinning of plaintiff's fractured finger which would be consistent with follow up treatment." Id. at ¶ 24. The defendants' threshold summary judgment argument is that, even if Pamer was not sent for the follow-up treatment at Natividad for possible pinning, the claim is time-barred. Because the complaint is time-barred and because of the allegation of missing records, the court will not proceed to adjudicate the alternative arguments made in defendants' motion for summary judgment.

[4] See, e.g., Pamer Depo., RT 70-71 (Pamer didn't tell Lt. Washington in October 1999 because he "didn't even think about it being a head injury at the time;" he knew he had been kicked in the head and it was mushy but "didn't think it was affecting" his hand/wrist.); RT 125 (Pamer referring to his first appeal "after I found out that it was a brain injury, when I finally got

13

accrual of the cause of action (and the commencement of the limitations period) did not depend upon him finding out that his hand/wrist problems had a neurological basis; he knew the facts critical to his deliberate indifference claim years earlier.   He knew in late September 1999 that he had not been returned to Natividad as ordered for a 3-week follow-up appointment and never sought further care while he was in Salinas Valley, except on one occasion on or about September 23, 1999, when he kicked on his cell door because of his pain.

Alternatively, if the cause of action did not accrue until a connection was made between the kick to the head and the hand/wrist problems, the claim would run into a different problem in that Pamer has no evidence that defendants acted with deliberate indifference.  The record is devoid of any evidence that, in 1999, defendants or Pamer connected the dots between hand/wrist pain and the head injury.  The records for the care provided within a day of the cell fight showed that the bruises and abrasions to Pamer's nose, left forehead and occipital skull were noted, as was a possible dislocation/fracture/deformity of his finger.  The records also showed that Pamer was alert and oriented after the incident and believed he had not lost consciousness.  His broken and dislocated finger would have been an obvious cause of hand/wrist pain. Nothing in the records reflected that medical care professionals connected any wrist/hand pain to a kick in the head nor that Pamer attempted to tell them there was a connection or described symptoms suggesting such a connection.  Pamer himself stated on October 2, 1999, that his head pain was diminishing.  Pamer has not provided any evidence that a medical care professional confronted with a patient who had hand/wrist pain who had just had his finger broken and dislocated in a fight would have thought there to be a connection between that pain and a kick in the head the patient also had suffered.  To be liable for an Eighth Amendment violation, a prison official must act with deliberate indifference to a known risk of

to see the neurosurgeon and he ordered MRIs"); RT 133 (after being asked whether he is saying that the head injury was actually manifesting itself on the right side of his body, Pamer responded: "Right. It's all down here. That's what the neurosurgeon found out three years later. He said, yes, it's focal dystonia. It's in the cerebral cortex, nerve center"); RT 134 (neurosurgeon consultation occurred after he wrote inmate appeals at CMC, not Salinas Valley, complaining that something was wrong); Complaint, Exh. A (attachment to CDC-602 filed June 25, 2002) (explaining 2-year delay as due to the fact that he had just received the test results).

serious harm to inmate health. See Farmer v. Brennan, 511 U.S. 825, 834, 837 (1994). The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he or she must actually draw that inference. Id. Pamer has not raised a triable issue of fact that any defendant knew of the alleged neurological source of hand/wrist problems in 1999, or that any defendant knew that not treating the hand/wrist problem as a neurological problem presented an excessive risk of harm to Pamer's health, or that any defendant actually drew the inference that not treating the hand/wrist problem as a neurological problem presented an excessive risk of harm to Pamer's health.

B.  Dr. Clark's Motion For Summary Judgment

Defendant Dr. Clark moves for summary judgment on the ground that he never provided medical care to Pamer and therefore cannot be found to have acted with deliberate indifference to a serious medical need. Pamer has failed to raise a triable issue of fact that Dr. Clark acted with deliberate indifference to his serious medical need. The evidence is undisputed that Dr. Clark did not treat Pamer during the months following the cell fight. The evidence also is undisputed that Dr. Clark was not in charge of the medical department and had no supervisory powers or duties in general or with respect to Pamer's case in particular.

Pamer contends that he told Dr. Clark in passing that he needed an orthopedic consultation. Pamer testified under oath that he was not even certain that it was Dr. Clark to whom he spoke. But even accepting as true – as the court must on summary judgment – Pamer's evidence that he made a statement to Dr. Clark, the vagueness of his statement and the context in which it was made are such that Pamer has not raised a triable issue of fact that Dr. Clark acted with deliberate indifference. Pamer stated at his deposition that he saw Dr. Clark walking in the prison yard and said "when am I going to see an orthopedic specialist." Pamer Depo., RT 110. In his declaration in opposition to the motion for summary judgment, Pamer stated that he "did approach Dr. Clark addressing the issue of not having any further follow-up treatment. [¶] That plaintiff was having serious problems with something being wrong, and that he was in severe pain and needed care." Pamer Decl., filed Aug, 27, 2007, ¶¶ 1-2 (docket # 62). Pamer's

1 inability to identify when he talked to Dr. Clark and what he specifically said to him are
2 significant. During at least part of the time, Pamer's hand was bandaged and his arm was in a
3 sling, so that telling a doctor that he was in pain would not have put a doctor on notice of a need
4 for further care. Pamer has not shown that a doctor hearing a prisoner complaining that he hadn't
5 received care but seeing him with a sling and bandages would believe there was any need to act.
6 Pamer also has failed to provide any evidence that Dr. Clark knew <u>anything</u> about Pamer's then-
7 current condition such that Pamer's complaint that he was had a medical problem would have
8 made any sense to Dr. Clark as he walked through the prison yard. That is, there is no evidence
9 that Dr. Clark knew that Pamer had his finger dislocated and fractured or had been kicked in the
10 head, that Dr. Clark knew that Pamer allegedly had been scheduled for a follow-up at Natividad,
11 or that he knew there was any neurological problem. Pamer also has failed to provide any
12 evidence that the procedure for obtaining non-emergency medical care was to call out to doctors
13 as they walked through the prison yard, as opposed to submitting a sick call request. Cf. <u>Resnick</u>
14 <u>v. Adams</u>, 348 F.3d 763, 770 (9th Cir. 2003) (prison had a legitimate governmental interest in
15 the orderly administration of a program that allowed prisons to accommodate the needs of
16 thousands of prisoners and that "[a]llowing inmates to make requests outside this system by
17 letters sent to various prison officials would frustrate the orderly administration" of the
18 program). On the meager statement Pamer provides, no reasonable juror could find in his favor
19 and against Dr. Clark on the claim for deliberate indifference to his serious medical needs. Dr.
20 Clark is entitled to judgment as a matter of law.

22 C.   <u>Pamer's Pleading Motion</u>
23        Last month, Pamer filed a "motion to file amended & supplemental complaint." He
24 explained in his motion that he wanted to amend and supplement his pleading "due to minor
25 discovery findings, inadvertance [sic] and occurrences of events that have transpired since the
26 filing of the original complaint." Motion, p. 1. He confusingly submitted both a proposed
27 supplemental complaint and a separate document called "proposed changes for third amended
28 complaint." Neither will be permitted. The motion to file an amended and supplemental

16

complaint is DENIED.

The "proposed changes for third amended complaint" deleted some claims the court already determined to be time-barred and made minor factual amplifications in the allegations against the existing defendants.[5] These proposed additions of factual information were unnecessary, as they were already covered by the allegations in the existing second amended complaint. He also included a new request for injunctive relief in his proposed third amended complaint which could not be granted against the existing defendants because they are all at Salinas Valley and Pamer was transferred out of that prison seven years ago. Additionally, the "proposed changes for third amended complaint" document does not comply with the court's order that Pamer attach his proposed amended complaint to his motion. See July 31, 2007 Order, p. 2. The document is, at best, a proposed amendment to the existing second amended complaint but the amendments sought to be made are unnecessary. The interests of justice do not require that leave to file the unnecessary document at this late date be granted.

Pamer also submitted a proposed "Prisoner's Supplemental Civil Rights Complaint," that seeks to add new defendants and new claims about events that occurred after he was transferred out of Salinas Valley. The court earlier dismissed the claims concerning events at the California Men's Colony and instructed Pamer to file a separate complaint in the proper district if he wanted to pursue them. See Order Of Partial Dismissal And For Further Amendment, p. 5. His supplemental complaint seeks to add 42 new defendants – none of whom are employed at Salinas Valley – and assert claims concerning classification, retaliation and other medical issues based on acts and omissions that occurred at prisons outside this district. The claims in the proposed supplemental complaint do not appear properly joined with the claims in the second amended complaint. The lateness of the proposed supplemental complaint plus the fact that there was already pending a defense motion for summary judgment plus the different focus of it convince the court that the interest of justice would not be served by permitting the filing of

---

[5] Although Pamer and defendant Clark earlier stipulated to allow Pamer to amend to change the Clark's job title, the proposed amended pleading doesn't change Clark's title in the way the parties stipulated.

17

a supplemental complaint.

Finally, the motion to file an amended and supplemental complaint is denied for the separate and independent reason that Pamer did not serve a copy of it on either defense counsel. Early in this case the court gave a standard admonition to plaintiff that he must serve on defense counsel a copy of every document he filed with the court, see Order Of Service And Partial Dismissal, p. 10, and less than two months ago, the court reminded the parties of the duty to serve copies on all other parties and plaintiff's obligation to serve copies on both defense attorneys, see July 31, 2007 Order, p. 3. It is a waste of judicial resources for the court to have to decide a motion and then reconsider the decision when it turns out that the motion was not properly served on the opponent and the opponent wants to be heard on the motion. Plaintiff's failure to comply with the court's orders is sufficient reason alone to deny his motion.

D.   Pamer's Injunctive Relief Request

Within the last week, Pamer filed a motion for a temporary restraining order and a preliminary injunction in which he requested that the court order him to be single-celled and given access to certain medications. Pamer's request was unrelated to the subject of this action – i.e., medical care he received eight years ago – and he is no longer at the prison where the defendants work. Injunctive relief is improper because the proposed TRO/preliminary injunction does not pertain to the issues as framed by the second amended complaint, it is sought against persons who are not defendants (or, if it is sought against defendants, would be ineffectual because Pamer is no longer at Salinas Valley), and the granting of summary judgment for defendants in this order shows that there is no likelihood of success on the merits of the complaint so that injunctive relief might be appropriate. See Kaimowitz v. Orlando, Fl., 122 F.3d 41, 43 (11th Cir. 1997), cert. denied, 523 U.S. 1138 (1998) ("A district court should not issue an injunction when the injunction in question is not of the same character, and deals with a matter lying wholly outside the issues in the suit"); Devose v. Herrington, 42 F.3d 470, 471 (8th Cir. 1994) ("a party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the

complaint"). Lastly, the proof of service indicates that the motion was not served on either defense attorney, although Pamer previously has been advised of the need to serve both defense attorneys with copies of anything he files. The motion for a TRO/preliminary injunction is DENIED. (Docket # 65.)

## CONCLUSION

For the foregoing reasons, the motion for summary judgment filed by defendants Lucine, Wittenberg and Jimenez is GRANTED and the motion for summary judgment filed by defendant Clark is GRANTED. (Docket # 45 and # 58.) Plaintiff's motion for leave to file a third amended and supplemental complaint is DENIED. (Docket # 60.) Plaintiff's motion for a temporary restraining order and preliminary injunction is DENIED. (Docket # 65.) Judgment will now be entered in favor of all defendants and against plaintiff. The clerk shall close the file.

IT IS SO ORDERED.

Dated: September 21, 2007

_____
SUSAN ILLSTON
United States District Judge